## Joshua W. Waterman v. Betsey A. Seeley and others.

*Equity jurisprudence: Quieting titles: Possession.* The case set out in the bill, being based on a claim for relief on the ground that the complainant has a complete equity, and that the defendants have set up claims that are subordinate to it and in fraud of it, is one of original equity cognizance, and not one in any way derived from the statute for quieting titles; and the fact that the complainant is out of possession is not important.

*Resulting trusts.* Resulting trusts, even before the statute abolishing them, were not in harmony with our land system; and are not to be extended beyond the line of authority.

*Intention: Payment.* To maintain a resulting trust there must have been an intention to create it; and the proofs should show, beyond any doubt, the actual payment of the consideration by the person seeking to raise the trust, and in his own individual money.

*Payment: Presumption: Donation: Advancement.* Proof of such payment will not alone raise a presumption of such an intention, where the title is taken in the name of a wife or child, or of one to whom the person paying the purchase money stands in *loco parentis;* the presumption in such case being rather that the payment is intended as a donation or advancement.

*Evidence.* The evidence in this case fails to prove an intention on the part of either of the parties to create a resulting trust; and does not satisfactorily prove even the payment.

*Equity jurisprudence.* A foreclosure purchaser, under a mortgage given by one who has no title to the lands described, is not entitled to relief against a third person, on the ground that the latter has fraudulently obtained the title to the land of the actual owner, notwithstanding such owner may have intended, without consideration, to put the title where it would have enured to the benefit of such purchaser, but was deceived into giving it to such third person.

*Heard July 24 and 25.   Decided October 8.*

Appeal in Chancery from Genesee Circuit.

*William Newton,* for complainant.

*Oscar Adams,* for defendants.

·CAMPBELL, J.

The bill in this cause was filed to perfect the title to cer·tain lands bid off by complainant upon a mortgage sale; ·and the necessity alleged for seeking relief arises out of the fact that the legal title was not in the mortgagor, and has never been in him, but has been so transferred and disposed of, as, in complainant's view, to give him an equity ·to reach it.    The bill was dismissed at the circuit, and some controversy has arisen concerning its nature, upon which the parties hold conflicting theories.    It therefore 'becomes necessary to consider upon what special equity the ·claim to relief is founded.

The bill sets forth a mortgage from Alanson A. Seeley to Ira Davenport, which was foreclosed under the statute, and the land bid off in October, 1860, by complainant. The redemption ran out in October, 1861, and the deed was recorded in December, 1861.    It is averred in the bill that the land was conveyed to Seeley by Isaac Parshall and ·Seraphina, his wife, June 30th, 1846, by warranty deed, but that they did not then hold the title; that the land was ·patented by the United States to George Luther; that when he gave the mortgage to Davenport, Seeley represented Mrs. Parshall to have inherited the· land from George Luther, as his heir at law, but that in fact Parshall and wife had only an equitable interest by reason of having ·furnished the purchase money, and that Roswell Luther, father of said George, was his heir at law, subject to that ·equity.

The bill further avers that one Harrison G. Conger, a brother-in-law of Alanson A. Seeley, and of Norris O. Seeley, one of the defendants, acting in concert with one Cornelius G. Rook, and with the knowledge, concurrence, aid, ·and abetting of all the defendants (except Mrs. Abrams), ·and of Chauncey W. Seeley, another brother, and with the design of defeating the mortgage, applied to . Roswell Luther, June 11, 1860, for a quit-claim to Conger, repre-

senting that he (Conger) had been requested by Parshall and wife, to call on him and obtain such quit-claim, for the purpose of confirming and making good the conveyance from the Parshalls to Alanson Seeley, and saving Mrs. Parshall from damage on her covenants; and representing also that such conveyance would enure to the benefit of those holding under the Parshall deed; and that Roswell Luther was induced thereby to convey his title, without any consideration, to Conger.

It then sets up a series of conveyances, alleged to be fraudulent and without consideration, first to Rook, and through him to Betsey A. Seeley (wife of Norris O. Seeley), of 76 acres, and to Judson S. Seeley and Stephen J. Seeley of the remaining 4 acres, containing a mill.

That Lucretia Abrams, widow of Alanson A. Seeley, was turned out of the premises after her husband's death in 1861, and that in 1863, on representing to Roswell Luther that the conveyance to Conger had defrauded Alanson Seeley's heirs, as well as complainant, she obtained from him a deed to herself, which the bill avers she holds for the purpose, first, of protecting complainant's rights, and second, of protecting her former husband's widow and heirs.

The bill claims and prays that the conveyances to Conger and those holding under him may be held void, and that Mrs. Abrams may hold her deed for the purposes mentioned, and may be restrained from using it to the prejudice of complainant, and asks for a second foreclosure, in case the first should turn out to be irregular, and offers, on payment of his mortgage, to release to Mrs. Abrams and her children.

It also asks for possession and releases, and a perpetual injunction.

It is apparent that complainant's case is based on the claim that he is entitled to relief against all these parties on the ground that he has a complete equity, and that they have set up claims that are subordinate to it and in fraud of it. If his theory is correct, the case is one of

original equity cognizance, and not in any way derived from the statute for quieting titles in favor of parties in possession. The fact that he is out of possession is not important.

. The case on which complainant rests himself by his bill, and the only one consistent with its general theory, is that a trust resulted to Isaac Parshall in the land in question, arising out of his payment of the original purchase money to the United States, whereby it is claimed George Luther was made a bare trustee, and Parshall the equitable owner. It is claimed further, however, that an independent cause of action arises out of the alleged frauds, without reference to any resulting trust.

If Parshall had this equitable interest, complainant claims to have succeeded to it as mortgage purchaser under Parshall's grantee, as against any but *bona fide* purchasers without notice of the trust; and it is claimed there are no such purchasers.

The claim to a resulting trust, springing from the payment of purchase money, though made the prominent feature of the bill, was not very strongly urged on the argument. The transaction took place before the adoption of the Revised Statutes of 1846, and therefore such resulting trusts were not forbidden. They are not, however, in harmony with our land system, and our courts have never been disposed to extend them beyond the line of authority.

In order to maintain such a trust, there must have been an intention to create it, and there must have been an actual payment of the consideration, made out beyond any doubt to have been the individual money of the party seeking to raise the trust. Proof of such payment will usually, as between strangers, raise a presumption in favor of such an intention, but even then, the trust raised by parol may be rebutted by parol. Mr. Sanders laid it down that such a trust could not be raised after the death of the person holding the legal title, without some written evidence.— *Sanders on Uses and Trusts, 322, and seq.* This seems to be

disputed. But the rule requiring the most convincing proof has been recognized here, and ought not to be relaxed.— *Bernard v. Bougard, Harr. Ch. R., 130 ;* see also *Botsford v. Burr, 2 J. C. R., 405 ; Jackson v. Bateman, 2 Wend., 570.*

No such presumption arises where the title is taken in the name of a wife or child, and the principle covers cases where, without legal relationship, the person paying the purchase money stands, or assumes to stand, in *loco parentis* to the grantee. The presumption there is both natural and legal, that in paying for land to be granted to the child so situated, it is intended as a donation or advancement, and not as a trust in favor of the donor.—*1 Sand., 325-6-7; Glaister v. Hewer, 8 Ves., 195, and note in 2 Hov. Suppl., 65 ; 1 Lead. Ca. in Eq., 195-6-7, 204-5, and cases.*

In *Beckford v. Beckford, Lofft., 490, and Currant v. Jago, 1 Collyer, 261,* the principle was applied very broadly, as well as in some of the American cases referred to in the notes to the leading cases cited. And the rule cannot be doubted, that such a trust cannot be inferred where there is any thing in the relations of the parties, and the facts of the transaction, which would fairly go to rebut it.

In the present case, the testimony of payment is all hearsay, and there is no documentary proof of it whatever. If the decision depended on the question of payment, we could not hold it proven. But if shown, it is very clear to our minds that the land was taken up for George Luther's benefit. He was a young boy taken to live with Mrs. Parshall, who was his aunt. The land was not required or used for any of Parshall's purposes, and if it had been designed as a trust for him, it would hardly have been placed in the name of an infant, and thus tied up during his infancy so as not to be available. The bill sets up, and it is altogether likely, that there was an idea that after George Luther's death, Mrs. Parshall was his heir. But there is no evidence tending to show that Parshall or

his wife had any notion of a resulting trust, or an equity, or that George's title was considered as a mere trust. We are convinced, upon the facts, that no one imagined or intended that George Luther was to have any merely nominal title. The land was his own for all purposes.

If this was so, the Parshalls had no more claim on it after his death than any strangers would have. It descended to Roswell Luther, as his heir at law, discharged of any equity, and subject to no interest or claim in anybody else. And the Parshalls had no right to seek a release from Roswell Luther. He was not bound in law or by any rule of equity to recognize any claim on their behalf.

Complainant's title fails entirely, upon any theory which rests upon the idea that the Parshalls had any such interest in the lands. Alanson Seeley could have no better claim than his grantors, and his mortgagee, and those purchasing under him, are in the same position. Their conveyances gave no title or interest in the land to any one. The only legal or equitable title was in Roswell Luther, and nothing short of the statutory limitation of actions could deprive him of it.

Luther's title has now been conveyed, either to Conger, or to Mrs. Abrams. Complainant insists that the various conveyances are either fraudulent as to him, or else that they enure to his benefit. It will be necessary, therefore, to consider this claim in its double aspect, legal and equitable. There is every reason to think there has been some very dishonest dealing. How far it affects complainant, is not so manifest. It is important to see just where he stood.

The parties standing behind the mortgage title were the Parshalls and Alanson Seeley. Assuming that under the mortgage complainant may stand upon the covenants of warranty, Alanson Seeley would have been liable to make good the amount of the mortgage, if the title failed. Whatever liability existed on the Parshall deed, must depend on

whose deed it purported to be. At the time when that deed was made, no provision had been adopted which enabled a married woman to enter into any binding covenant, although she could convey lands by joining with her husband. The deed to Seeley, however, does not purport to be a deed of her land, but is in the form generally used where the husband is grantor. This may be immaterial, unless in one contingency,—which does not appear to have happened,—that is, a subsequent vesting of title in the wife. There was no personal liability against Mrs. Parshall, and it could have done her neither good nor harm to have the title left as it was. Seeley was interested in having it made good.

The conveyances from Luther did not, as actually made, enure to the benefit of the Parshall and Seeley title. They are not deeds of confirmation, but purport on their face to be absolute, and for the sole use and benefit of Conger, on the one hand, and Mrs. Abrams, on the other, free from any trust or condition; and no such trust or condition is evidenced by any other instrument. Neither of them was given for any valuable consideration passing from any person whatever. No one, therefore, has any resulting trust arising out of the fraudulent purchase, in the name of another, of land which he paid for and wished to have in his own name. Neither Conger nor Mrs. Abrams took for the Seeley estate. If that estate has any claim, it must be for a broken contract, which may create an equity, or for some fraud equivalent in its effects.

It is not claimed in the bill that there was ever any contract, or understanding, or desire, on the part of Alanson Seeley, that a title should be obtained in confirmation of his, and there is no charge and no proof that there was ever any bargain between him and Conger whereby the latter should hold any title he might get from Luther, for any present or future benefit of Alanson. However mean and wrong it may have been to encourage the enforcement of an adverse title, it deprived complainant of no existing

right, and of no right he might have asserted. It did not change the relative positions of Alanson Seeley and complainant. If Seeley had obtained any interest from Luther, perhaps it would have enured to complainant; but he was not entitled to demand one, and was not legally compellable to purchase one, or to obtain it in any way. And Conger was not disabled from getting one for himself, if he chose, and if he could.

But when we come to the proofs there is no testimony whatever, except hearsay of a vague nature (and not admissible for any purpose), which connects any one but Conger with the fraud alleged. And we must consider on whom this fraud was committed, and upon what pretext.

Luther says he was induced to convey to Conger by a letter from Mrs. Parshall requesting it, and by his statements that he wanted to mortgage the land, and could not from the defect of title, and that they would come back on Mrs. Parshall unless they could get the title; and that Conger produced the patent to George, and told Luther of his heirship to his son.

It does not appear that Mrs. Parshall was moved or sought to be moved by any threats or representations of difficulty to herself, nor that complainant's mortgage was in her mind in any way. She says she was informed they wanted to get the land secured for the widow and children. No other witness explains what was said to her. It only appears further that she requested of her brother Roswell Luther that the deed should be made to Conger, and it does not appear that she imposed any conditions, or asked any questions. She was not a party interested, and the fact that she may have been made one of the innocent means for carrying out a fraud on her brother, would give her no ground of action or complaint on her own account.

Luther was the only person defrauded. Had Conger, after obtaining the deed, confessed his fraud, neither Mrs. Parshall, Alanson Seeley, nor complainant could have prevented Luther from ratifying the deed, or from making

any new bargain with Conger. It was a mere act of benevolence, and gave no one any rights not secured by the deed itself. If he was not satisfied with the deed as he had made it, he could complain and have it rescinded for the fraud, and could then keep the land for himself, or make any new disposition of it, at his pleasure. But it concerned no one else. And it must stand or fall according to its terms. It cannot be affected by any parol conditions or intentions.

It remains to be seen whether complainant is in any way helped by the deed to Mrs. Abrams.

The deed to Conger was not void. It was at most only voidable, and required the action of a court of equity to have it canceled and to regain the title. If the deed to Mrs. Abrams could be treated as an assignment of Luther's right to complain of the fraud, and if such an assignment can be upheld as a lawful transfer of an interest in land (upon which there would be difficulty), it is still, in whatever way it is viewed, a deed to her and to her heirs for their own use, and not a deed to her for the use of Alanson Seeley's estate, or of complainant. It is not a conveyance of an equity of redemption, but of an adverse title; and there is no legal or equitable principle which can make it subject to any right of complainant. The bill does not aver, nor does the testimony show any trust or agreement affecting it.

The good faith of Conger's grantees we have not deemed it necessary to consider, because we do not find that complainant is entitled to assail Conger himself, for any fraud in obtaining his deed. And for the same reason we have not found it necessary to determine how far the record shows any competent proofs of such fraud. There is very little legal evidence of any kind in the case.

Stripped of all its encumbrances, the case presents this simple state of facts: Complainant has a defective title, but has all that any one with whom he dealt could give him. The owner of the genuine title, who was not bound

to release it to anybody, may have intended, entirely without consideration, to put it where it would have benefited complainant, but was deceived into giving it to some one else.    Complainant purchased when this title was already on record, and without any reason to suppose he could claim any thing under it.    It is a case where the law can afford him no remedy, beyond such claim as he may have on his covenants.

The decree must be affirmed, with costs.

The other Justices concurred.